UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>For Online Publication Only</u>

-----------------------------------------------------------------------X

UNITED STATES OF AMERICA,

**<u>MEMORANDUM & ORDER</u>**
20-cr-518 (JMA)

-against-

FILED
CLERK

10/24/2025 10:49 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

GARY JOHNSON,

Defendant.

-----------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Defendant Gary Johnson filed the instant motion under Federal Rule of Criminal Procedure

Rule 29(c) for a judgment of acquittal on Counts Four, Five, and Nine.[1]  (<u>See</u> ECF No. 196.)

Defendant was convicted at trial of various crimes relating to his narcotics distribution, including

distribution that resulted in serious bodily injury to three individuals who overdosed on drugs he

sold.  With respect to Counts Four and Five, Defendant argues there was insufficient evidence at

trial to establish that: (i) the substance Defendant distributed to John Doe #1 and Jane Doe #1 on

March 3, 2020 was fentanyl; and (ii) fentanyl was the "but-for" cause of John Doe #1's and Jane

Doe #1's serious bodily injuries.  (<u>See</u> <u>id.</u> at 5-11.)  With respect to Count Nine, Defendant similarly

argues that there was insufficient evidence at trial to establish that: (i) the substances Defendant

distributed to John Doe #2 on May 1, 2020 were fentanyl and cocaine; and (ii) fentanyl and cocaine

were the but-for cause of John Doe #2's serious bodily injury.  (<u>See</u> <u>id.</u> at 11-14.)  Finally,

Defendant argues that there was insufficient evidence that John Doe #1, Jane Doe #1, and John

Doe #2 each suffered serious bodily injury.  (<u>See</u> <u>id.</u> at 14-15.)  The Government opposes, arguing

that the evidence presented at trial was overwhelming and far exceeds the applicable Rule 29

---

[1] Defendant does not challenge his convictions on Counts Three, Six through Eight, and Ten through Twenty-Four of the Second Superseding Indictment.

standard. (See ECF No. 201.) For the reasons that follow, Defendant's motion is denied in its entirety.

## I.    BACKGROUND

### A.    Procedural History

On February 11, 2025, a grand jury sitting in the Eastern District of New York returned a twenty-six count Second Superseding Indictment (the "Indictment") charging Defendant with:

- Conspiracy to distribute and possess with intent to distribute controlled substances, specifically, substances containing heroin and fentanyl, in violation of 21 U.S.C. §§ 841(b)(1)(A)(i), 841(b)(1)(B)(vi), and 846 (Count One);

- Use of firearms in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two);

- Distribution of and possession with intent to distribute controlled substances, specifically, substances containing heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts Three, Six through Eight, and Eleven through Twenty-Three);

- Distribution of controlled substances, specifically, substances containing fentanyl, which caused serious bodily injury to John Doe #1 and Jane Doe #1, respectively, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts Four and Five);

- Distribution of controlled substances, specifically, substances containing fentanyl and cocaine base, which caused serious bodily injury to John Doe #2 and the death of Jane Doe #2, respectively, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts Nine and Ten);

- Possession of a firearm following a felony conviction, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) (Count Twenty-Four);

- Possession of a defaced firearm, in violation of 18 U.S.C. §§ 922(k), 924(a)(1)(B) (Count Twenty-Five); and

- Destruction of evidence, specifically, controlled substances, in violation of 18 U.S.C. § 1519 (Count Twenty-Six).

(See ECF No. 127.)

Following more than two weeks of trial, on May 22, 2025, and May 27, 2025, the jury returned guilty verdicts on Counts Three through Twenty-Four[2]; returned a verdict of not guilty on Count Twenty-Six; and failed to return verdicts on Counts One, Two, and Twenty-Five.  (See ECF No. 185-9.)

## B.    The Evidence at Trial

The Government's evidence at trial consisted of 19 witnesses, including victim John Doe #2, medical professionals, a law enforcement officer who had extensive personal observations of Defendant's drug sales, and two drug dealers who testified as to their narcotics purchases from Defendant.  The Government also presented documentary evidence including medical records, evidence from Defendant's phones reflecting his drug trafficking activities, drug paraphernalia, a firearm and ammunition found in Defendant's residence on the date of his arrest, substances recovered from seventeen controlled buys law enforcement conducted using a confidential informant, and video and audio recordings of the controlled buys.

### 1.    Counts Four and Five—Overdoses of John Doe #1 and Jane Doe #1

The evidence at trial—including an audio recording of a 911 call, first responder records, and testimony from Kayla Fillippi and the responding EMTs—established that John Doe #1 and Jane Doe #1 overdosed at approximately 8:48 p.m. on March 3, 2020, in the parking lot of Baseball

---

[2] The jury returned a verdict of guilty on Count Ten's lesser-included charge of distribution of cocaine base and fentanyl to Jane Doe #2, and returned a verdict of not guilty as to the charge of distribution of cocaine base and fentanyl causing the death of Jane Doe #2.

Heaven in Yaphank, New York, after ingesting fentanyl sold by Defendant. (Trial Transcript ("Tr.") 604:15–614:2, 750:10–767:23, 782:24–794:6; GX 801, 802, 804.) That same day, a confidential informant, Michael Imbese, purchased drugs—purportedly heroin—from Defendant, as part of a controlled buy monitored by law enforcement officers. (Tr. 108:21–109:2.) The evidence at trial established, based on testing by an accredited laboratory, that the substance Imbese purchased from Defendant that day was fentanyl. (Tr. 108:21–129:3; 915:15–919:17.) The fact that Defendant was selling fentanyl to a purported user seeking heroin on March 3, 2020 supported a reasonable inference that Defendant distributed that same substance—fentanyl—to John Doe #1 and Jane Doe #1 that same day. (Tr. 1376:22–1377:6.)

Fillippi testified that Defendant sold her and her then-boyfriend, Dylin Bumpus, the drugs on which John Doe #1 and Jane Doe #1 overdosed on March 3, 2020. (Tr. 607:18–608:24.) Fillippi had been buying drugs from Defendant since the fall of 2018. (Tr. 590:11–593:14.) When she wanted to buy drugs from Defendant, she or Bumpus would call or text Defendant, and Defendant would tell Fillippi and Bumpus where to meet him to pick up the drugs. (Tr. 593:15–20.) Fillippi testified that on March 3, 2020, she and Bumpus bought drugs from Defendant on behalf of John Doe #1 and Jane Doe #1. (Tr. 604:15–606:22.) According to Fillippi, the reason for this arrangement was that John Doe #1 and Jane Doe #1 did not know Defendant, and it was Fillippi's understanding that people Defendant did not know should not buy drugs from him directly. (Tr. 606:23–607:17.) Fillippi testified that she and Bumpus met John Doe #1 and Jane Doe #1 at Baseball Heaven, where John Doe #1 and Jane Doe #1 provided her and Bumpus money to buy the drugs from Defendant. (Tr. 607:18–608:3.) Fillippi and Bumpus then drove directly across the street to the ADESA[3] parking lot to meet Defendant. (Tr. 608:6–19.) Using the money

---

[3] The transcript misspells ADESA as "Odessa" during Fillippi's testimony. The location is spelled correctly elsewhere in the transcript, such as during Detective Petrucci's testimony explaining Defendant's use of ADESA Long Island as a location for drug transactions. (Tr. 133:22-134:1.)

4

from John Doe #1 and Jane Doe #1, Fillippi testified that she bought a "gram or two" of what she believed to be heroin from Defendant, but subsequently clarified that, in general, she did not know whether she in fact got fentanyl from Defendant when she requested heroin. (Tr. 608:20–609:2, 637:21–638:8.)

Fillippi testified that she and Bumpus then drove directly back to Baseball Heaven, where John Doe #1 and Jane Doe #1 were waiting. (Tr. 609:9–15.) After they returned, Fillippi and Bumpus parked their car next to John Doe #1 and Jane Doe #1, with their car windows open. (Tr. 610:7–9.) Fillippi and Bumpus took "about half" of the drugs and handed the rest to John Doe #1 and Jane Doe #1, through the car windows. (Tr. 609:12–18.) Fillippi testified that she used some, but not all, of her share of the drugs, and that afterwards, she no longer felt narcotics withdrawal symptoms, which indicates that the substance contained narcotics. (Tr. 609:19–610:16.) According to Fillippi, she also personally observed Bumpus, John Doe #1, and Jane Doe #1 use the drugs she and Bumpus had just purchased from Defendant. (Tr. 609:25–610:9.) Fillippi testified that after using the drugs, she observed John Doe #1 begin to overdose, followed shortly thereafter by Jane Doe #1. (Tr. 610:17–21.) Fillippi and Bumpus exited their car, and found that John Doe #1 and Jane Doe #1 were each unconscious. (Tr. 610:8–9, 22–24.) Fillippi called 911; the audio recording of her 911 call, which Fillippi identified, was admitted as evidence at trial. (Tr. 610:25–611:1; GX 506, GX 801.) During the recorded 911 call, Fillippi described John Doe #1 and Jane Doe #1 as unconscious, and attempted to count Jane Doe #1's respirations (breaths) with the emergency dispatcher. (GX 801.)

John Dalen, a first responder with the Yaphank Fire Department, testified that he was the first person to respond to the scene. (Tr. 743:1–3, 752:2–15, 753:18–754:6.) Dalen testified that he began treating the first person he encountered, which was the male victim (John Doe #1), before turning to the female victim (Jane Doe #1). (Tr. 754:7–10.) Dalen testified that neither victim had

any pulse when he began treatment. (Tr. 754:11–755:3, 756:7–13.) Dalen provided CPR to the male victim and was able to observe the male victim's pulse return. (Tr. 755:21–756:6.) Sheila Skidmore, a volunteer EMT with the Yaphank Fire Department, also treated John Doe #1 at the scene. (Tr. 780:1–3, 787:10–21.) Skidmore testified that she took over from the first responder treating John Doe #1, at which time John Doe #1 had a pulse, but was not breathing adequately enough to support his own life. (Tr. 784:9–785:7.) Skidmore testified that John Doe #1 had pinpoint pupils, which indicated to her that he was suffering from an opiate overdose, so she gave him a dose of Narcan intranasally. (Tr. 785:4–20.) After John Doe #1 did not respond to the first dose of Narcan, Skidmore gave John Doe #1 a second dose, delivered intravenously, which she explained works more quickly than intranasal doses. (Tr. 785:4–786:7.) Upon receiving the second dose of Narcan, John Doe #1 was resuscitated. (Tr. 786:8–12.)

Dalen testified that, after determining Jane Doe #1 did not have a pulse, he began CPR on her, and estimated he performed CPR for "almost" eight minutes. (Tr. 756:7–16.) After an ambulance arrived with an automated machine for conducting CPR, Dalen switched from manual CPR to the automated machine. (Tr. 756:17–757:6.) Dalen testified that Jane Doe #1 regained consciousness following a combination of CPR and the administration of Narcan. (Tr. 757:7–20.) Dalen testified that Jane Doe #1 "did not want to go to the hospital" but that she agreed to go after Dalen "expressed that she was dead five minutes ago in cardiac arrest." (Tr. 757:18–25.) Dalen and Skidmore also each testified regarding the patient care records for John Doe #1 and Jane Doe #1, which were entered into evidence. (Tr. 758:8–767:24, 786:23–794:7; GX 802, 804.)

Dr. Joseph Artale, the emergency room doctor who treated Jane Doe #1 on the day of her overdose, was qualified as an expert witness in emergency treatment for opioid overdoses, including with respect to the physical effects of opioids. (Tr. 1128:16–1129:8, 1162:19–21.) He testified that, based on his review of their medical records and patient care reports, John Doe #1

6

and Jane Doe #1 each showed classic signs of an opiate overdose consistent with the use of fentanyl, and that each would have died absent medical intervention. (Tr. 1154:12–25, 1161:9–1162:3.) Dr. Artale explained that fentanyl is "a synthetic opioid that is roughly 50 to 100 times the potency of morphine" and that fentanyl is "fast acting," meaning the body reacts to it very quickly. (Tr. 1131:10–1132:14.) Dr. Artale testified that while it can take the human body "less than five minutes" to experience the effects of heroin, fentanyl's effects are experienced "[a]lmost instantaneously." (Tr. 1133:22–1134:2.)

Notably, the same day John Doe #1 and Jane Doe #1 overdosed on drugs from Defendant, law enforcement used confidential informant Imbese to conduct a controlled buy of heroin from Defendant, as Detective Michael Petrucci testified. (Tr. 108:21–109:2.) Imbese provided the drugs he purchased from Defendant—four plastic bags each containing a powder substance—to Detective Petrucci, who secured them and submitted them for laboratory testing. (Tr. 114:13–115:8.) Meaghan McCarthy, a forensic scientist with the Suffolk County Crime Laboratory—who was qualified as an expert in forensic chemistry—testified that, based on her lab analyses, each of the bags purchased by Imbese on March 3, 2020 contained fentanyl, and one of the bags indicated 4-ANPP, a precursor to fentanyl.[4] (Tr. 907:8–20, 915:15–23, 918:8–21.) McCarthy testified that her analyses determined that the four bags contained a total of 1.7993 grams of fentanyl. (Tr. 919:15–17.)

## 2.    Count Nine—Overdose of John Doe #2

The evidence at trial—including first responder records, as well as the testimony of John Doe #2 and the EMT who responded to John Doe #2's overdose—established that John Doe #2 overdosed shortly before 11:21 a.m. on May 1, 2020, in Saint James, New York, after ingesting fentanyl sold by Defendant. (Tr. 977:17–994:7, 1049:9–1088:17; GX 1002.) Toxicology testing

---

[4] Precursor chemicals, like 4-ANPP, are used in making fentanyl. Tr. 1274:14-21.

of the blood of John Doe #2's wife, Jane Doe #2, who also used the drugs John Doe #2 purchased from Defendant, revealed the presence of fentanyl, cocaine, and a metabolite of cocaine, among other substances.  (Tr. 1078:2–11, 1209:10–1212:13; GX 904.)

John Doe #2 testified that he purchased drugs from Defendant on "at least a hundred" occasions between 2018 and October 2020.  (Tr. 1050:6–20, 1054:3–5.)  John Doe #2 testified that when he was using drugs, his wife Jane Doe #2 would use them with him, and that he would generally handle buying the drugs, although his wife bought crack "[a] handful of times" without him.  (Tr. 1056:21–1057:11.)  John Doe #2 testified that his wife did not have access to heroin, and that only he "knew someone that sold [heroin]," referencing Defendant.  (Tr. 1057:12–15.)  At trial, text messages between John Doe #2 and Defendant were admitted into evidence, and John Doe #2 identified an April 30, 2020, text message exchange between Defendant and himself.  (Tr. 1057:16–1060:2; GX 701.1.)  These text messages, along with other text message exchanges between Defendant and John Doe #2 arranging drug sales, were recovered from a phone in Defendant's bedroom.  (Tr. 375:10–14, 528:17–529:21; GX 225, 701.)

With respect to the April 30, 2020, text messages, John Doe #2 testified that they reflected him and Defendant arranging a drug transaction for that evening.  (Tr. 1059:20–23, 1061:16–1062:11.)  In the text messages, John Doe #2 told Defendant that he was looking for "both hard and d."  (GX 701.1.)  John Doe #2 explained that hard was a slang name for crack cocaine, and that "d" was short for dope, which was slang for heroin.  (Tr. 1062:8–11.)  John Doe #2 testified that he in fact bought drugs from Defendant that evening, buying approximately $50 of crack and $100 of what he thought was heroin from Defendant at a Stop & Shop parking lot on Route 101.  (Tr. 1064:3–13, 1065:5–11; see also Tr. 1074:4–7.)  After buying the drugs, John Doe #2 returned home and used them with his wife, using all of the crack cocaine and "about half" of the purported heroin.  (Tr. 1074:15–19, 1078:5–11.)

The next morning, on May 1, 2020, John Doe #2 woke up feeling sober and left for work at around 5:30 a.m. (Tr. 1080:7–12.) John Doe #2 testified that he took half of what he thought was the leftover heroin with him, and left the remainder at his home with his wife. (Tr. 1080:17–23.) While at work, John Doe #2 used the drugs that he had brought with him from home during a break necessitated by inclement weather. (Tr. 1081:10–1082:1.) John Doe #2 testified that he remembered he felt the drugs hit him "strong," walked out of the bathroom, and then collapsed near his pickup truck. (Tr. 1082:9–18.) EMT Jennifer Masem, who was a full-time paramedic with the Saint James Fire Department at the time, responded to the scene after receiving a 911 call. (Tr. 966:21–24, 978:1–979:3.) Masem testified that when she arrived, she spoke to John Doe #2's co-workers and checked on John Doe #2, who was unresponsive. (Tr. 979:19–980:1.) Masem testified that John Doe #2's condition was consistent with an opioid overdose, based on his pinpoint pupils, his rate of breathing, and the coloring in his face. (Tr. 982:10–15.) Masem also testified that she administered two dosages of Narcan to John Doe #2, after which his condition improved. (Tr. 986:17–19, 992:15–23.) Masem further testified regarding the patient care record for John Doe #2, which was entered into evidence. (Tr. 977:17–978:18; GX 1002.) Masem testified that, according to the patient care record, John Doe #2 initially had a respiratory rate of 4 breaths per minute, which would eventually cause his heart to stop and result in his death because he was not getting enough oxygen. (Tr. 984:23–986:6.) Masem testified that John Doe #2 was ultimately transported to the closest medical facility because his condition was critical in light of his overdose. (Tr. 993:17–994:6.)

John Doe #2 testified that, after being released from the hospital on May 1, 2020, he returned home. (Tr. 1086:14–20.) John Doe #2 testified that, upon arriving home, he walked inside and his three-year-old son told him "mommy fell down" and "[m]ommy got sick." (Tr. 1087:4–8.) John Doe #2 then found his wife, Jane Doe #2, lying on the bathroom floor, and called

911.  (Tr. 1087:9–11.)  John Doe #2 testified that the police who responded informed him that his wife was dead.  (Tr. 1087:25–1088:3.)

Dr. Aaron Rosen, the medical examiner who conducted Jane Doe #2's autopsy, testified that Jane Doe #2 died from an overdose of cocaine and fentanyl.  (Tr. 1194:25–1195:4, 1204:1–10, 1215:1–20.)  Dr. Rosen testified that, as part of the autopsy, he collected and sent tissue and fluid samples to be analyzed by the toxicology lab.  (Tr. 1209:10–17.)  Dr. Rosen testified as to the results of that toxicology analysis, explaining that cocaine was found in the femoral blood, along with a metabolite of cocaine, benzoylecgonine.  (Tr. 1211:1–19.)  Dr. Rosen also testified that fentanyl was found in Jane Doe #2's femoral blood in a quantity of 38.6 micrograms per liter, a level he described as "very high," along with morphine at a level he described as being at a "low therapeutic level."  (Tr. 1212:5–9, 1213:19–1214:21.)  Dr. Rosen further explained that testing of femoral blood from the femoral veins, as contrasted with blood from other areas in the body, yields the most accurate results.  (Tr. 1209:18–1210:17.)

There was evidence at trial indicating that Jane Doe #2 may have purchased drugs from a separate individual on the night before her overdose death.  (Tr. 1113-1114.)  Text messages between John Doe #2 and Jane Doe #2 show communication from Jane Doe #2 about getting money from John Doe #2 and meeting someone other than Defendant at 7:30pm on April 30, 2020 to purchase crack cocaine. (Tr. 1113–1115; Def. Ex. 4).  Additionally, at 7:11pm, Jane Doe #2 had a 25-second-long phone call with a contact saved in her phone as "Big Black."  (Def. Ex. 10.)

### 3.    Additional Evidence of the Defendant's Drug Sales in 2020

In addition to Defendant's drug sales on March 3, 2020, and April 30, 2020, the Government presented evidence at trial establishing that Defendant sold heroin and fentanyl on numerous other dates in 2020.  Specifically, Detective Petrucci testified that Imbese, acting at the direction of law enforcement, purchased suspected narcotics from Defendant on eighteen separate

occasions. (Tr. 108:15–20.) The Government entered into evidence the suspected narcotics purchased on each of these occasions; video and audio recordings of the controlled buys; and recorded calls and text messages between Defendant and Imbese setting up various of the buys. (Tr. 108:21–307:21, 915:15–953:6; GX 101–118, 119.1–37.)

The following table included in the Government's opposition brief sets forth the date of each controlled buy; whether the recovered substance included a controlled substance, and if so, which; the weight of the recovered substance; and the corresponding trial exhibit and transcript cites:

| Date of Controlled Buy | Confirmed Controlled Substances | Net Weight | Exhibit No. and Transcript Cite for Lab Results |
|---|---|---|---|
| 3/3/2020 | Fentanyl | 1.7993g | GX 101; Tr. 919:15-17 |
| 3/5/2020 | Fentanyl | 5.2031g | GX 102; Tr. 921:13-20 |
| 3/11/2020 | Fentanyl | 3.6053g | GX 103; Tr. 923:8-15 |
| 3/13/2020 | Fentanyl | 4.9063g | GX 104; Tr. 925:3-10 |
| 5/6/2020 | Fentanyl | 2.9736g | GX 105; Tr. 926:19-927:2 |
| 5/8/2020 | Fentanyl | 4.9787g | GX 106; Tr. 928:13-21 |
| 5/12/2020 | Fentanyl | 5.8836g | GX 107; Tr. 930:9-16 |
| 5/20/2020 | Heroin and Fentanyl | 5.8049g | GX 108; Tr. 932:2-9 |
| 6/4/2020 | None | - | GX 109; Tr. 933:25-934:8 |
| 6/12/2020 | Heroin and Fentanyl | 2.2176g | GX 110; Tr. 936:8-15 |
| 6/16/2020 | Heroin and Fentanyl | 4.0034g | GX 111; Tr. 938:4-15 |
| 7/9/2020 | Heroin | 2.9101g | GX 112; Tr. 940:9-22 |
| 7/29/2020 | Heroin | 2.8882g | GX 113; Tr. 943:1-12 |
| 8/7/2020 | Fentanyl | 6.0099g | GX 114; Tr. 945:1-15 |
| 8/25/2020 | Heroin and Fentanyl | 5.9201g | GX 115; Tr. 947-4-18 |
| 10/14/2020 | Heroin and Fentanyl | 2.6337g | GX 116; Tr. 949:6-14 |
| 10/29/2020 | Fentanyl | 2.4834g | GX 117; Tr. 951:1-8 |
| 11/12/2020 | Heroin | 1.8505g | GX 118; Tr. 952:24-953:6 |

(ECF No. 201 at 11.)

## II.    DISCUSSION

### A.    Legal Standard

"If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal pursuant to Federal Rule of Criminal Procedure 29(c), but it may do so only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (cleaned up). "A conviction must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," and the evidence must be viewed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." Id. (emphasis in original); see also United States v. Pugh, 945 F.3d 9, 19 (2d Cir. 2019) ("The reviewing court must defer to the jury's assessment of witness credibility and its assessment of the weight of the evidence.") (cleaned up). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (cleaned up).

In conducting this analysis, "the evidence must be viewed in its totality," because each fact presented at trial may be affected and given context by the other facts. United States v. Landesman, 17 F.4th 298, 319 (2d Cir. 2021) (quoting United States v. Cassese, 428 F.3d 92, 98-99 (2d Cir. 2005)). Importantly, "[t]he jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation." Pugh, 945 F.3d at 19 (quoting United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008)). Thus, a defendant challenging a jury's guilty verdict "bears a heavy burden." United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017) (internal quotation marks omitted). In addition to resolving issues

regarding witness credibility in the government's favor, the court must leave to the jury the task of choosing among competing inferences that can be drawn from the evidence. See, e.g., Pugh, 945 F.3d at 19; see also United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (explaining that court must take care not to overtake the role of the jury and that it is the jury's role to "choose among competing inferences").

**B.    There Was Sufficient Evidence to Convict Defendant on Counts Four and Five**

With respect to Counts Four and Five, Defendant argues that there was insufficient evidence at trial that: (i) the substance Defendant distributed to John Doe #1 and Jane Doe #1 on March 3, 2020 was fentanyl; and (ii) fentanyl was the "but-for" cause of John Doe #1's and Jane Doe #1's serious bodily injuries. (ECF No. 196 at 5-11.) For the reasons below, these arguments fail.

**1.    The Jury Reasonably Concluded that Defendant Distributed Fentanyl to John Doe #1 and Jane Doe #1**

As Defendant concedes, "when viewing the evidence of Fillippi's testimony in the light most favorable to the government" . . . "there was sufficient proof that a controlled substance distributed by [Defendant] was received by [Jane Doe #1] and [John Doe #1]." (ECF No. 196 at 7.) Therefore, the crux of Defendant's argument is that the evidence at trial was insufficient to prove that fentanyl was the substance Defendant distributed to John Doe #1 and Jane Doe #1, through Fillippi and Bumpus, on March 3, 2020. (Id. at 5-8.) Defendant contends, in sum and substance: (1) there was no way to know what type of opiate caused John Doe #1's and Jane Doe #1's overdoses; (2) it is speculative to conclude that, because Defendant sold fentanyl to Imbese on October 3, 2020, the substance Defendant sold to Fillippi and Bumpus that day was also fentanyl; and (3) Bumpus may have "manipulated" the drugs when he split the amount from Defendant into two portions, before providing one portion to John Doe #1 and Jane Doe #1. (Id.)

Defendant's arguments fail under the Rule 29 standard, as these arguments fail to draw all reasonable inferences in favor of the Government.

As the Second Circuit has articulated, "a defendant may be convicted of narcotics possession if some evidence—direct, circumstantial, or otherwise—establishes the defendant's possession of the illegal substance." United States v. Bryce, 208 F.3d 346, 353 (2d Cir. 1999). Following Bryce, the Second Circuit reiterated that the testimony of "habitual" drug users is "plainly adequate to permit the jury to find beyond a reasonable doubt" that a substance was in fact the substance alleged. United States v. Hamilton, 334 F.3d 170, 181 (2d Cir. 2003) (finding, in context of a Rule 29 motion, that testimony of "habitual crack users" was sufficient to establish that substance at issue was crack cocaine). The Second Circuit has further emphasized that "neither actual drug exhibits nor reports of chemical analysis are required to support a conviction for possession of a controlled substance." United States v. Gaskin, 364 F.3d 438, 460 (2d Cir. 2004).

The Government's proof at trial was more than sufficient for a reasonable jury to conclude that the substance Defendant sold to Fillippi and Bumpus on March 3, 2020 was fentanyl. Fillippi testified that, although it was her understanding that she was getting heroin when she bought drugs from Defendant, she did not know whether she was, in fact, getting fentanyl when she asked for heroin. (Tr. 637:21–638:8.) Fillippi testified that the drugs she bought from Defendant on March 3, 2020 were "good" because she did not feel withdrawal symptoms after using them, (Tr. 610:10–16), which suggests that Fillippi ingested an opiate, such as fentanyl, that day. Furthermore, as noted in Section I.B.3, supra, on fourteen occasions when Defendant sold Imbese what Defendant represented to be heroin, Defendant in fact sold him either fentanyl or a fentanyl/heroin mix—sales Defendant does not challenge in the instant motion. Notably, on March 3, 2020—the date of John Doe #1's and Jane Doe #1's overdoses—Defendant sold Imbese fentanyl, representing that it

14

was heroin. And indeed, Defendant did the same on four other occasions in March 2020. Based on that evidence, the jury reasonably could have inferred that it similarly was fentanyl that Defendant sold to Fillippi on March 3, 2020.

Dr. Artale's expert testimony further supports the reasonable inference that Defendant sold Fillippi fentanyl on March 3, 2020. Dr. Artale explained that, while heroin and fentanyl are both opiates, heroin is "slower," is not as potent, and "last[s] a little bit longer as well." (Tr. 1130:23–25, 1132:24–1133:2.) Dr. Artale explained that, with heroin, it can take the body "less than five minutes" to begin to experience the effects of the drug, whereas with fentanyl, the effects are experienced "[a]lmost instantaneously." (Tr. 1133:22–1134:2.) Fillippi testified that after she used the drugs she bought from Defendant on March 3, 2020, she saw John Doe #1, and then shortly thereafter, Jane Doe #1, begin to overdose. (Tr. 610:17–24.) Fillippi stated that by the time she got out of her car to check on them, both John Doe #1 and Jane Doe #1 were unconscious. (Tr. 610:17–24.) The testimony regarding the rapid deterioration in the condition of both victims is consistent with Dr. Artale's description of fentanyl's nearly instantaneous effect on the human body.

Defendant's arguments that the jury could not reasonably infer that Defendant sold Fillippi and Bumpus fentanyl on March 3, 2020 are unavailing. There is no factual support for a theory that Fillippi bought drugs that day from someone other than Defendant, and the jury was certainly not required to accept this speculative theory. Moreover, Defendant's speculation that Bumpus somehow "manipulated" the drugs sold by Defendant before giving them to John Doe #1 and Jane Doe #1 likewise fails. There is no support in the record for such a theory, and regardless, that is precisely the type of competing inference that the jury was permitted to reject. See, e.g., Pugh, 945 F.3d at 19. In sum, viewing the direct and circumstantial evidence in its totality and drawing all reasonable inferences in favor of the Government, there was more than sufficient evidence for

the jury to conclude that the substance provided by Defendant on which John Doe #1 and Jane Doe #1 overdosed was fentanyl.

## 2. The Jury Reasonably Concluded that Fentanyl Was a "But-For" Cause of John Doe #1's and Jane Doe #1's Serious Bodily Injuries

Defendant next challenges the jury's finding that the fentanyl Defendant distributed, and which John Doe #1 and Jane Doe #1 ingested, was "the but-for" cause of their overdoses and resulting serious bodily injuries. (ECF No. 196 at 8-11.) Defendant argues that the jury could not reach such a conclusion without additional evidence regarding other drugs in their systems or additional expert testimony. (Id. at 10-11.) That argument is unavailing for the following reasons.

In Burrage v. United States, the Supreme Court held that "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under . . . 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." 571 U.S. 204, 218-19 (2014). "Burrage distinguished between instances in which the defendant's narcotics trafficking 'merely played a nonessential contributing role' in the [serious bodily injury], which does not suffice to establish causation, and instances in which the 'incremental effect' of the drugs was the 'straw that broke the camel's back,' which does suffice." United States v. Sica, 676 F. App'x 81, 84 (2d Cir. 2017) (summary order) (quoting Burrage, 571 U.S. at 211-12). Thus, the narcotics distributed need only be "*a* but-for cause of the victim['s] [serious bodily injury], not *the sole* cause." Sica, 676 F. App'x at 83-84 (emphasis in original).

The evidence at trial was more than sufficient for the jury to have reached the conclusion that the fentanyl distributed by Defendant was "*a* but-for cause" of John Doe #1's and Jane Doe #1's overdoses. Fillippi testified that, on March 3, 2020, John Doe #1 and Jane Doe #1 asked her and Bumpus to buy them drugs "because they couldn't find them." (Tr. 627:15-23.) Fillippi did not observe John Doe #1 or Jane Doe #1 ingest any other substances that could have caused or

16

contributed to their overdoses, and they did not exhibit behaviors suggesting they had ingested other substances.  When asked whether John Doe #1 and Jane Doe #1 took other drugs while she and Bumpus were buying drugs from Defendant—which Fillippi said took approximately five to 10 minutes—Fillippi answered "[t]hey told us they didn't take anything because they were looking for us to help them."  (Tr. 629:1-13.)  Moreover, Fillippi testified that John Doe #1 and Jane Doe #1 ingested the drugs distributed by Defendant and then almost immediately thereafter suffered overdoses.  (Tr. 610:4-21.)  Medical professionals testified that the effects of their overdoses were counteracted by the administration of Narcan, which is effective only in counteracting overdoses involving opiates, such as fentanyl.  (See, e.g., Tr. 757:7-15, 785:4-786:9, 1136:15-17.)  Based on such evidence, a reasonable jury could have inferred that John Doe #1 and Jane Doe #1 did not use any other drugs while waiting for Fillippi and Bumpus to buy them drugs from Defendant, and that they overdosed on the drugs supplied by Defendant.

    Defendant's various arguments that there was insufficient evidence for the jury to conclude that Defendant's fentanyl was a but-for cause of the overdoses of John Doe #1 and Jane Doe #1 are unavailing.  Defendant notes that John Doe #1 and Jane Doe #1 told hospital staff that they had used marijuana that they believed was laced with another drug.  (ECF No. 196 at 10; see ECF No. 218 at 6.)  However, this argument ignores the medical testimony that the overdoses were consistent with opiate use and not consistent with smoking marijuana.  (See ECF No. 201 at 20.) Nor does any evidence in the record support that John Doe #1 and Jane Doe #1 smoked marijuana that was "laced with something."  Fillippi also explained that she personally observed John Doe #1 and Jane Doe #1 use the drugs she and Bumpus bought from Defendant.  (Tr. 610:4-9.)

    Furthermore, contrary to Defendant's suggestion, (see ECF No. 196 at 10), the Government was not required to present evidence such as blood or urine testing to prove the substance in John Doe #1's and Jane Doe #1's systems.  At least one Circuit expressly has rejected any requirement

that "but-for causation under § 841(b)(1)(C) requires evidence from blood toxicology tests." United States v. Sadler, 24 F.4th 515, 546 (6th Cir. 2022) (collecting cases). And courts within this Circuit have repeatedly rejected the proposition that the government must present any particular type of evidence, such as laboratory results. See, e.g., United States v. Wyche, No. 18-CR-561, 2023 WL 6890112, at *12 (E.D.N.Y. Oct. 19, 2023) ("[T]he jury's verdict need not be based on any particular type of evidence 'so long as the evidence taken together is such that a 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (quoting United States v. Lee, 660 F. App'x 8, 15 (2d Cir. 2016)); United States v. Bowen, No. 18-CR-205, 2021 WL 4044906, at *6 (S.D.N.Y. Sept. 3, 2021) ("Defendant's contention [regarding] the Government's use of circumstantial evidence and its failure to offer specific kinds of evidence and laboratory testing is inapposite."). Moreover, it is well established that the jury's verdict may properly be "based entirely on circumstantial evidence." United States v. Goffer, 721 F.3d 122, 124 (2d Cir. 2013).

In sum, viewing the direct and circumstantial evidence in its totality and drawing all reasonable inferences in favor of the Government, there was more than sufficient evidence for the jury to conclude that the substance Defendant distributed to John Doe #1 and Jane Doe #1 was a but-for cause of their overdoses and resulting serious bodily injuries.

**C.    There Was Sufficient Evidence to Convict Defendant on Count Nine**

With respect to Count Nine, Defendant similarly argues that there was insufficient evidence at trial that: (i) the substances Defendant distributed to John Doe #2 on May 1, 2020 were fentanyl and cocaine; and (ii) fentanyl and cocaine were the but-for cause of John Doe #2's serious bodily injury. For the reasons below, these arguments fail.

### 1.    The Jury Reasonably Concluded that the Defendant Distributed Fentanyl and Cocaine to John Doe #2

The Government's proof at trial was more than sufficient for a reasonable jury to conclude that Defendant sold fentanyl and cocaine to John Doe #2 on April 30, 2020.  During his testimony, John Doe #2 made an in-court identification of Defendant as the dealer John Doe #2 bought drugs from on April 30, 2020.  (Tr. 1050:6–20, 1073:25–1074:1.)  Notably, John Doe #2 testified that he purchased drugs from Defendant on "at least a hundred" occasions between 2018 and October 2020.  (Tr. 1054:3–5.)  The frequency with which John Doe #2 bought drugs from Defendant lent credibility to his identification of Defendant as the individual from whom he purchased drugs on April 30, 2020.  Moreover, John Doe #2's testimony was corroborated by text messages between himself and Defendant, which were entered as evidence at trial.  At trial, John Doe #2 testified about a text message exchange with Defendant on April 30, 2020, which John Doe #2 explained showed him arranging a drug transaction with Defendant for that evening.  (Tr. 1057:16–1065:2; GX 701.1.)  In the text messages, John Doe #2 stated he was looking for "both hard and D," which John Doe #2 testified were slang names for crack cocaine and heroin, respectively.  (GX 701.1; Tr. 1062:3–11.)  John Doe #2 further testified that he and his wife, Jane Doe #2, used some of what he understood was heroin that night, and all of the cocaine.  (Tr. 1078:2–7.)  John Doe #2 took some of the remaining drugs with him to work the next morning, leaving the rest with his wife.  (Tr. 1080:17–23.)  John Doe #2 used some of the remaining drugs at work, which led to his overdose, the circumstances of which are consistent with a fentanyl overdose.  (Tr. 992:15–23, 1081:22–1082:18, 1146:19–24.)  John Doe #2 testified that he used the drugs in the bathroom, felt them hit him "strong," walked across the parking lot to his car, and then collapsed.  (Tr. 1082:9–18.)  As described above, Dr. Artale explained that the effects of fentanyl are experienced "[a]lmost instantaneously"—just as John Doe #2 described.  (Tr. 1133:22–1134:2.)

Additionally, Jane Doe #2 overdosed on the same day that John Doe #2 overdosed, and Jane Doe #2 died.  The medical examiner who conducted her autopsy, Dr. Rosen, testified that fentanyl was found in her blood, in a quantity of 38.6 micrograms per liter, a level he described as "very high."  (Tr. 1212:5–9, 1213:19–1214:21.)  A metabolite of cocaine, benzoylecgonine, was also found in her blood.  (Id.)  In addition, as set forth in Part I.B.3, supra, Defendant sold fentanyl to Imbese on three separate occasions in May 2020, and sold a fentanyl/heroin mix to Imbese on one occasion in late May 2020.  Together, this was more than sufficient evidence from which a jury reasonably could conclude that Defendant sold fentanyl and cocaine to John Doe #2 on April 30, 2020.

Defendant's arguments that he did not sell John Doe #2 fentanyl and cocaine on April 30, 2020 are unavailing.  First, it was reasonable for the jury to reject Defendant's theory that, because Defendant did not sell Imbese cocaine during the controlled buys, Defendant also did not sell cocaine to John Doe #1.  See, e.g., Pugh, 945 F.3d at 19.  Detective Petrucci, who monitored the controlled buys, testified that Imbese only asked to buy heroin from Defendant during each of those buys.  (Tr. 307:8–10.)  Although lab testing revealed that Defendant often sold Imbese fentanyl rather than heroin, there was extensive evidence presented at trial that dealers often sold fentanyl claiming it was heroin, whereas there was no evidence that dealers sold fentanyl claiming it was cocaine.  (See, e.g., Tr. 1282:7–16.)  Furthermore, there is ample evidence that Defendant sold crack cocaine on other occasions.  For example, John Doe #2 and Fillippi each testified that they had repeatedly purchased crack cocaine from Defendant, and text messages recovered from Defendant's phones show him arranging sales of crack cocaine.  (Tr. 681:17–682:1, 824:23–825:10, 1053:24–1054:2.)  To the extent Defendant argues that evidence regarding the presence of drugs other than fentanyl and cocaine (such as the presence of heroin in Jane Doe #2's toxicology results) undercuts the Government's theory that Defendant sold fentanyl and cocaine, that too was

an inference that the jury was free to—and did—reject. Drawing all reasonable inferences in favor of the Government, there was more than sufficient evidence for the jury to conclude that the Defendant distributed fentanyl and cocaine to John Doe #2 on April 30, 2020.

**2.    The Jury Reasonably Concluded that Fentanyl and Cocaine Were a "But-For" Cause of John Doe #2's Serious Bodily Injury**

Defendant also challenges the jury's finding that the fentanyl and cocaine sold by Defendant to John Doe #2 were the but-for cause of his overdose and resulting serious bodily injury. (ECF No. 196 at 11-14.) Specifically, Defendant argues that there was insufficient evidence to prove that fentanyl and cocaine base were the independently sufficient "but-for" cause of John Doe #2's overdose. (Id. at 14.) This argument is unavailing.

Based on the evidence at trial, a jury reasonably could have concluded that the drugs Defendant sold to John Doe #2 were the but-for cause of his overdose. John Doe #2 testified that the only drugs he possessed in the hours before his overdose were the ones supplied to him by Defendant. (Tr. 1076:13–24.) He testified that the evening before his overdose, he used the crack cocaine supplied by Defendant, as well as a portion of the fentanyl supplied by Defendant, which John Doe #2 at the time believed to be heroin. (Tr. 1078:2–7.) John Doe #2 smoked the crack cocaine and injected the fentanyl using a needle. (Tr. 1078:8–9.) The next day, during a work break, John Doe #2 used what he estimated to be "less than a tenth of a gram" of the remaining fentanyl he had purchased from Defendant. (Tr. 1082:2–4.) Indeed, there is no evidence in the record to suggest *any* other cause of John Doe #2's overdose. It was reasonable for the jury to credit John Doe #2's testimony in this regard, as it evidently did in rendering its guilty verdict on Count Nine. This Court must defer to such a credibility finding. See Pugh, 945 F.3d at 19.

Defendant also argues that there was insufficient evidence to sustain a conviction on Count Nine because the jury in Count Ten acquitted Defendant of causing Jane Doe #2's death. (See ECF No. 196 at 13-14; ECF No. 218 at 8-10.) This argument is also unavailing. First, "[i]t is well

established that 'a criminal defendant convicted by a jury on one count [cannot] attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count.'" United States v. Martinez, 110 F.4th 160, 172 (2d Cir. 2024) (quoting United States v. Powell, 469 U.S. 57, 58 (1984)).  Accordingly, a court reviewing a conviction "look[s] only to the evidence presented to the jury, not to its verdicts on other counts, when assessing the factual sufficiency of a conviction."  Id. at 173.  And notably, here, Defendant at trial advanced different arguments regarding the but-for causes of John Doe #1's overdose and Jane Doe #1's death, including arguing in summation that Jane Doe #2 might have acquired drugs from another source during the time she and John Doe #2 were apart.  (See, e.g., Tr. 1448:12–22.)  The jury's partial acquittal on Count Ten thus bears no significance on the sufficiency of the evidence to convict Defendant on Count Nine.

### D.    The Jury Reasonably Concluded that John Doe #1, Jane Doe #1, and John Doe #2 Each Suffered Serious Bodily Injury

Defendant's final argument is that, even if the jury properly found both that he distributed to John Doe #1, Jane Doe #1, and John Doe #2 the drugs charged in the indictment and that those drugs caused their overdoses, none of the three victims actually suffered serious bodily injury. (ECF No. 196 at 14-15.)  This argument fails for the following reasons.

The Government's proof at trial was more than sufficient for a reasonable jury to conclude that John Doe #1, Jane Doe #1, and John Doe #2 each suffered serious bodily injury.  EMT Dalen testified that both John Doe #1 and Jane Doe #1 were in cardiac arrest—that is, they did not have detectable pulses—when he first evaluated them upon arriving at the scene of their overdoses.  (Tr. 754:11–21, 756:1–13.)  EMT Masem testified that when she first arrived on scene, John Doe #2 had a respiratory rate of four breaths per minute, which could lead his heart to stop beating and ultimately to death.  (Tr. 984:23–986:6.)  The evidence at trial demonstrated that each of these victims received nearly immediate, emergency medical intervention that resuscitated them.  For

example, EMT Dalen performed manual CPR on John Doe #1, and also used a bag valve mask, which is a mechanical device, to deliver oxygen. (Tr. 755:4–25.) EMT Skidmore then administered two doses of Narcan to John Doe #1, including one delivered intravenously after a dose delivered nasally did not reverse the effects of the overdose; John Doe #1 was resuscitated following the second dose. (Tr. 785:4–786:10.) With respect to Jane Doe #1, after approximately eight minutes of manual CPR, EMT Dalen used the automated machine to continue mechanically providing chest compressions, as well as a bag valve mask. (Tr. 755:4–9, 756:14–757:10.) EMT Dalen administered Narcan to Jane Doe #1, which ultimately reversed the effects of her overdose. (Tr. 757:10–17.)

John Doe #2 similarly was resuscitated due to quick emergency medical intervention. When EMT Masem began treating John Doe #2, his respiratory rate was four breaths per minute, which, as noted above, was not sufficient to sustain life. (Tr. 984:23–986:6.) EMT Masem used a bag valve mask to provide oxygen, and also administered two dosages of Narcan, which ultimately reversed the effects of his overdose. (Tr. 986:17–993:11.) Dr. Artale, an emergency room doctor who was qualified at trial as an expert in, inter alia, the consequences of not receiving treatments following opiate overdoses, unequivocally testified that in each instance, but for timely medical intervention, John Doe #1, Jane Doe #1, and John Doe #2 would have died or sustained serious bodily injury. (Tr. 1128:16–1129:8, 1146:3–10, 1154:12–16, 1161:9–13.)

At trial, the jury was therefore squarely presented with Defendant's argument that the Government had not proven serious bodily injury, and it chose to reject that argument. (See Tr. 1445:6–10; 1450:3–5; 1474:2–1475:5.) Defendant contends that Dr. Artale's expert testimony was "speculative" because "no testing was done to determine the levels or types of drugs consumed making it impossible to determine how long symptoms may have persisted" absent medical intervention. This is simply another competing inference, which the jury was entitled to reject

based on the evidence before it.  See, e.g., Pugh, 945 F.3d at 19; Jackson, 335 F.3d at 180.  There was more than sufficient evidence from which a reasonable jury could conclude that the victims each suffered bodily injury that involved a substantial risk of death.

### III.    CONCLUSION

For the reasons stated above, Defendant's motion is denied in its entirety.

**SO ORDERED.**

Dated:    October 24, 2025
          Central Islip, New York

_____
/s/ (JMA)
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE